CLERKS OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED
4/17/2025
LAURA A. AUSTIN, CLERK
BY: s/ ARLENE LITTLE
      DEPUTY CLERK

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF VIRGINIA
### LYNCHBURG DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 6:22-CR-00007 |
| v. | MEMORANDUM OPINION |
| JERIWON TAYLOR, | JUDGE NORMAN K. MOON |
| *Defendant.* | |

Petitioner Jeriwon Taylor moves *pro se* to vacate, set aside, or correct his sentence due to alleged ineffective assistance of counsel, pursuant to 28 U.S.C. § 2255. Dkt. 80 (habeas corpus petition). Taylor makes three arguments: First, his counsel should have done more to attack the Government's case, given reliability issues with the Government's key informant. Second, his counsel did not file an appeal, as he requested. Third, his counsel "attempted to solicit" his spouse.

Upon consideration of the record and the applicable law, the Court concludes that an evidentiary hearing is required to rule on the second issue raised by Taylor's petition, regarding his counsel's failure to file a requested appeal. The Court will direct that a hearing be scheduled on that issue.

However, the Court finds that an evidentiary hearing is not required to rule on the remainder of Taylor's petition.

Accordingly, except for the allegation that his counsel failed to file a requested appeal, Taylor's petition, Dkt. 80, is **DENIED,** and the Government's motion to dismiss, Dkt. 85, is

**GRANTED.**

I. **Legal Standard**

   A. **Section 2255 Motions**

To state a viable claim for relief under § 2255, a petitioner must prove: (1) that his sentence was "imposed in violation of the Constitution or laws of the United States;" (2) that "the court was without jurisdiction to impose such a sentence;" or (3) that "the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255(a). The petitioner bears the burden of proving grounds for a collateral attack by a preponderance of the evidence. *Jacobs v. United States*, 350 F.2d 571, 574 (4th Cir. 1965). The district court, in ruling on a § 2255 motion, is required to hold a hearing "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b). Although the district court has discretion to make this determination, generally a hearing is required "when a movant presents a colorable Sixth Amendment claim showing disputed facts beyond the record, or when a credibility determination is necessary to resolve the claim." *U.S. v. Mayhew*, 995 F.3d 171, 176-77 (4th Cir. 2021). Courts have an obligation to construe § 2255 motions liberally when the petitioner proceeds pro se. *Mayhew*, 995 F.3d at 184.

   B. **Ineffective Assistance of Counsel Claims**

Ineffective assistance of counsel violates the Sixth Amendment and is therefore a ground for a Section 2255 motion. *See Strickland v. Washington*, 466 U.S. 668, 685–86 (1984). Under the framework set forth in *Strickland*, ineffective assistance claims consist of two elements: a petitioner must show that his counsel's performance was **deficient,** and that he was **prejudiced** as a result of the counsel's deficient performance. *Strickland*, 466 U.S. at 687. In applying

*Strickland*, courts need not address both prongs if the petitioner makes "an insufficient showing on one." *Moore v. Hardee*, 723 F.3d 488, 500 (4th Cir. 2013).

To establish deficient performance, a person challenging a conviction must show that "counsel's representation fell below an objective standard of reasonableness." *Harrington v. Richter*, 562 U.S. 86, 104 (2011) (citing *Strickland,* 466 U.S. 688 (1984)). A court considering a claim of ineffective assistance must apply a "strong presumption" that counsel's representation was within the "wide range" of reasonable professional assistance. *Strickland*, 466 U.S. at 689. The petitioner must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. at 687.

With respect to prejudice, a challenger must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id*. at 693. Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id*. at 687.

## II. Background

The Court draws the following facts from the Indictment, the Statement of Facts, and the Presentence Investigation Report filed in this case; Taylor's guilty plea and sentencing transcripts; and the parties' briefing on the instant motion. In particular, because Taylor challenges the propriety of the Government's investigation, the Court draws heavily from the Government's search warrant affidavit, Dkt. 85-1.

### A. Investigation and Arrest

Taylor came under investigation for drug trafficking in 2021. Members of the Lynchburg

Police Department and the federal Drug Enforcement Agency set up a series of controlled buys between Taylor and a confidential informant, CC-1. The first controlled buy occurred on October 27, 2021. Dkt. 85-1 at 6. Over text message, Taylor agreed to sell CC-1 one pound of methamphetamine for $5,500. Taylor then "delivered CC-1 approximately one pound of a substance that field tested positive for methamphetamine" at a location in Lynchburg, Virginia. Dkt. 85-1 at 6. "Before and after the controlled purchase, law enforcement searched CC-1 and his vehicle and no contraband was located." Dkt. 85-1 at 6.

During the post-buy surveillance, "law enforcement identified [Taylor as] the driver, and sole occupant, of the vehicle used to deliver the methamphetamine." Dkt. 85-1 at 6. Law enforcement traced the vehicle, a rental vehicle, to a rental agreement executed by Taylor, from which law enforcement also gathered Taylor's address and phone number. Dkt. 85-1 at 6-7. This enabled law enforcement to begin geo-tracking Taylor's phone, after executing a separate administrative subpoena and search warrant. Dkt. 85-1 at 6-7.

The second controlled buy occurred on November 9, 2021. Unlike the first, law enforcement located a firearm in CC-1's vehicle during a pre-buy search. Dkt. 85-1 at 9. The firearm was seized and "the potential criminal violation was referred to the Commonwealth Attorney's Office for evaluation." Dkt. 85-1 at 6-7. After removing the firearm, law enforcement found no additional contraband and continued with the controlled purchase. Dkt. 85-1 at 9. "CC-1 provided [Taylor] with $5,500 USC of Special Service funds in exchange for the methamphetamine. The substance provided by [Taylor] field tested positive for methamphetamine." Dkt. 85-1 at 9. Taylor came in a different car this time, but law enforcement traced the vehicle to a woman who, according to her social media profile, was married to Taylor. Dkt. 85-1 at 9.

After the second controlled buy, however, CC-1 went rogue. He engaged Taylor in several un-sanctioned drug purchases. One of these purchases led to a shootout between Taylor and CC-1 in a Walmart parking lot, as CC-1 later explained:

> CC-1 [] advised that, on the evening of November 21, 2021, CC-1 contacted [Taylor] and ordered two pounds of methamphetamine. CC-1 advised that later that same evening CC-1 met [Taylor] in the parking lot of Wal-Mart (Wards Rd, Lynchburg, Virginia). CC-1 advised that CC-1 got into [Taylor]'s vehicle, a silver Dodge Charger. [Taylor] provided CC-1 a Sheetz bag containing two pounds of crystal methamphetamine and one ounce of heroin. CC-1 advised that CC-1 then produced a handgun and struck [Taylor] with the firearm. CC-1 advised that CC-1 exited the vehicle with the bag of narcotics and fled on foot. CC-1 advised that while running away, [Taylor] began shooting at CC-1. CC-1 advised that CC-1 began shooting at [Taylor] with CC-1's firearm. CC-1 advised that CC-1 then hid the firearm in a drainage ditch in the 3900 block of Wards Road, Lynchburg, Virginia. CC-1 later escorted law enforcement to the location in which CC-1 hid the firearm. Law enforcement located the aforementioned firearm at the location described by CC-1.

*See* Dkt. 85-1 at 10-11.

In December 2021, the Government submitted a search warrant for a storage shed associated with Taylor. Dkt. 85-1. The search warrant affidavit acknowledged that CC-1 had his own extensive criminal history and involvement,[1] and that CC-1 provided statements to law enforcement "with the hope of receiving potential consideration on CC-1's criminal charges." *See* Dkt. 85-1 at 4-5. The warrant was based in part on tips from CC-1, but it relied heavily on information gleaned from other investigative sources, too, such as physical and geo-location

---

[1] The search warrant affidavit stated that "CC-1 has been charged in Lynchburg, Virginia for narcotics distribution and firearm related offenses and is awaiting trial. CC-1 has pending firearms-related charges in Bedford County, Virginia and Amherst County, Virginia. CC-1 has a pending firearms charge in Salem, Virginia. CC-1's criminal history reflects ten felony convictions, including: Grand Larceny, Probation Violation, Burglary, and Distribution of Controlled Substance. CC-1 provided statements to law enforcement about CC-1's involvement in a drug trafficking organization that were against CC-1's penal interest. CC-1 assisted law enforcement with this investigation with the hope of receiving potential consideration on CC-1's criminal charges." *See* Dkt. 85-1 at 4-5.

surveillance of Taylor's movements; vehicle registration searches; postal service records; telecommunications data; rental agreements; and billing history. *See* Dkt. 85-1 at ¶¶ 34-52. During execution of the search warrant, officers located drugs and the firearm Taylor had discharged during the Walmart shootout. Dkt. 60 at 3. Subsequent laboratory testing confirmed the substances recovered in the storage shed were fentanyl, heroin, and methamphetamines. Dkt. 65 at 5.

Taylor was subsequently indicted by a grand jury for two counts of distributing more than 50 grams of methamphetamine, in violation of 21 U.S.C. § 841 (Counts One and Two); possessing and discharging a firearm in furtherance of a drug-trafficking crime, in violation of 18 U.S.C. § 924(c) (Count Three); unlawfully possessing a firearm as a felon, in violation of 18 U.S.C. § 922(g)(1) (Count Four); and possessing more than 40 grams of fentanyl and more than 100 grams of heroin with the distributive intent, also in violation of 21 U.S.C. § 841 (Counts Five and Six). *See* Dkts. 1, 29.

B. **Pre-Trial Proceedings**

In 2023, Taylor pled guilty to Counts 1 and 3, methamphetamine distribution and possession and discharge of a firearm in furtherance of such distribution. *See* Dkt. 58 (Plea Agreement). Pursuant to his guilty plea, Taylor adopted as true a statement of facts which set forth the relevant facts supporting his guilt for Counts 1 and 3. These facts included the two controlled drug purchases, the Walmart shootout, and the discovery of drugs and a firearm in his storage shed. Dkt. 60. In his guilty plea colloquy, Taylor again confirmed that these facts were true, as proffered by the Government at the hearing. Dkt. 77 at 12.

> The Court: [To Defendant] You heard the assistant United States
> attorney state the facts of the case. Do you agree that they are true?

>Taylor: Yes, sir.
>
>The Court: And you admit your guilt?
>
>Taylor: Yes.

Dkt. 77 at 12.

>Taylor also acknowledged that he was waiving his right to appeal.
>
>>Defense Counsel: Mr. Taylor acknowledges that he's waiving his right to appeal, except those matters that cannot be waived for appeal, certain constitutional arguments he might be able to make on appeal, but he nonetheless waives his right to a direct appeal.
>>
>>[ . . . ]
>>
>>The Court: [To Defendant] It's just mentioned you're giving up your right to appeal the guilty verdict in this case, except for those matters that you may not waive your right . . . .
>>
>>Taylor: Yes, sir.
>>
>>The Court: You're voluntarily doing so?
>>
>>Taylor: Yes, I'm voluntarily doing so.

Dkt. 77 at 10-12.

>Finally, Taylor affirmed that he was satisfied with counsel.
>
>>The Court: Are you fully satisfied with the counsel, representation, and advice given to you in this case by your attorney?
>>
>>Taylor: Yes.

Dkt. 77 at 4.

At sentencing, there were no objections to the Presentence Investigation Report, and the Court adopted the PSR's findings subject to Taylor's 11(c)(1)(C) plea agreement, which bound the Court to a sentencing range between 240 and 252 months imprisonment. Taylor's counsel argued for 240 months, the lowest end of the range. *See* Dkt. 79 at 5-10 (Sentencing Hearing

Transcript). The Court imposed 240 months imprisonment. Dkt. 70 (Judgment).

**III.    Discussion**

Taylor now raises three ineffective assistance of counsel claims. First, he argues that his attorney, Robert Dean, should have done more to oppose the Government's case, since the Government's evidence was in part developed through the use of a criminally culpable informant. Second, he argues that his counsel did not file an appeal as Taylor allegedly requested. Third, he makes oblique allegations that his counsel, who was later disbarred for sexual misconduct, attempted to solicit Taylor's spouse during the representation. The Court concludes that none of Taylor's arguments have any merit, and his petition will therefore be denied.

**A.  Failure to Move to Suppress under *Franks*, *Brady*, or *Giglio*, and Other Failure to Investigate Claims**

Taylor's petition disproportionately advances one central grievance: that his counsel should have done more to discredit the Government's case against him, since it was developed using a confidential informant who was also a criminal. *See* Dkt. 80 at 2-3 ("Had counsel filed the motion to suppress as requested or done a proper investigation[,] it would have revealed obvious bias and other extremely important facts that had to be hidden from either the magistrate or the grand jury."); ("The CI is a known gang member and also a violent offender who was in violation of the law and should have been arrested at that point. However, the authorities let him go forward . . . . The authorities continued to use the CI for another controlled buy and the CI was not arrested until the CI 'went rogue' and robbed the defendant Taylor at gunpoint and shot 7 rounds at Taylor attempting to take his life . . . . All of these egregious acts were committed by the CI during an active investigation of Taylor and would attest to the unreliability of the CI.").

Despite Taylor's indignation, however, the criminal culpability of the Government's informant does not automatically discredit the evidence obtained therefrom. Furthermore, CC-1's criminality does not constitute grounds for any pre-trial motion that Taylor's counsel could have made, such that counsel's decision to enter plea negotiations *sans* motion was not ineffective.

Taylor argues that CC-1's criminality pointed to "potential Franks, Brady, or Giglio claims," see Dkt. 80 at 4, but those cases mandate disclosure, and at every turn the Government disclosed all materials it was required to disclose. *Franks r*equires that a warrant be voided—and any evidenced or testimony gathered therefrom excluded—where the defendant shows that the affiant knowingly, intentionally, or with reckless disregard for the truth included a false statement in the affidavit and this false information was essential to the probable cause determination. *See U.S. v. Colkley*, 899 F.2d 297, 300 (4th Cir. 1990) (citing *Franks v. Delaware*, 438 U.S. 154 (1978)). *Brady* and *Giglio*, meanwhile, require the Government to disclose exculpatory evidence or information that the defendant could use to impeach the Government's witnesses at trial. *See generally U.S. v. Wolf*, 860 F.3d 175, 272 (4th Cir. 2017). Here, the Government complied with both of these requirements.

Per *Franks*, the Government's search warrant affidavit disclosed CC-1's criminality from top to bottom. The affidavit disclosed that CC-1 possessed a firearm during a pre-buy search, *see* Dkt. 85-1 at 6-7, 9; that CC-1 later engaged Taylor in an unsanctioned drug transaction that led to a shootout in the Walmart parking lot, *see* Dkt. 85-1 at 10-11; and that CC-1 had his own extensive criminal history.[2] Indeed, the affidavit stated that CC-1 provided statements to law

---

[2] The search warrant affidavit stated that "CC-1 has been charged in Lynchburg, Virginia for narcotics distribution and firearm related offenses and is awaiting trial. CC-1 has pending firearms-related charges in Bedford County, Virginia and Amherst County, Virginia. CC-1 has a pending firearms charge in Salem, Virginia. CC-1's criminal history reflects ten felony convictions, including: Grand Larceny, Probation Violation, Burglary, and Distribution of Controlled Substance. CC-1 provided statements to law enforcement about CC-1's involvement in a drug trafficking organization that were against CC-1's penal interest. CC-1 assisted law enforcement with this

enforcement "with the hope of receiving potential consideration on CC-1's criminal charges." *See* Dkt. 85-1 at 4-5. All of this information was disclosed to the magistrate for purposes of assessing reliability and probable cause, thereby obviating any grounds for a *Franks* motion.

 Similarly, CC-1's criminality was at least partially disclosed to defense counsel. Taylor's counsel acknowledged that "proceeding to trial carrie[d] some risk" for the Government, "given the circumstances with the CI." *See* Dkt. 85-2 (email exchange between Government and Robert Dean during plea negotiations). Counsel stated that "[i]f the CI is willing to rob a suspect and lie to law enforcement about his whereabouts, and in fact carry-on drug dealing while working as a CI, it raises serious questions about their overall veracity." *Id*. Thus, counsel was aware of some of the CI's criminality, and he properly recognized that such information would be useful impeachment material at trial. However, to the extent that the Government failed to disclose any additional impeachment evidence, that does not support a *Brady* motion, because the Government is not obligated to "disclose material impeachment evidence prior to entering a plea agreement with a criminal defendant." *United States v. Ruiz*, 536 U.S. 622, 633 (2002).

 Furthermore, Taylor cannot succeed by claiming a want of disclosure of *exculpatory* evidence, for two reasons. First, as a matter of law "it is unclear whether *Brady* applies even to exculpatory evidence, as opposed to impeachment evidence, in a plea setting. The Supreme Court left open that question in *Ruiz*, and our court has yet to resolve it." *United States v. Garrett*, 128 F.4th 583, 615 (4th Cir. 2025) (Quattlebaum, J., dissenting); *see also United States v. Fisher*, 711 F.3d at 472 (Agee, J., dissenting) ("Even if one were to assume, however, that the evidence at issue here is affirmatively exculpatory (quite an extraordinary stretch), rather than merely for impeachment purposes, there is no existing precedent from the Supreme Court or this

---

investigation with the hope of receiving potential consideration on CC-1's criminal charges." *See* Dkt. 85-1 at 4-5.

Court that entitles Fisher to relief on the basis of his pre-plea claim."). Second, because "even if we were to assume that the prosecution's failure to disclose material exculpatory evidence at the plea stage could result in an unknowing plea in certain narrow circumstances," Taylor has pointed to no evidence in the record that would demonstrate that "his guilty plea was entered unknowingly for this reason." *United States v. Moussaoui*, 591 F.3d 263, 286 (4th Cir. 2010). Taylor argues that counsel "should never have entertained pleading guilty until a plethora of items were obtained, i.e., reports about CI and firearm, policy and procedure, charging info against CI, CI's mental state, and more." Dkt. 80 at 5. Most specifically, he argues that his counsel should have obtained Lynchburg Police Department records to show that CC-1 violated their policy regarding informants. But again, information of this sort relates **only to impeachment** of CC-1. It has no tendency to exculpate Taylor. And Taylor points to no other information in the record that would exculpate him. Thus, his counsel had no grounds to upon which to base a *Brady* motion for nondisclosure of exculpatory evidence.

Nor was his counsel deficient in deciding to enter plea negotiations in lieu of additional investigation, as Taylor argues. The Government had ample other evidence that did not rely on CC-1's credibility: each controlled buy was surveilled, and the texts and phone calls leading up to the transactions were recorded. Dkt. 85 at 6. The subsequent search warrant was based in part on tips from CC-1, but it also relied on physical and geo-location surveillance of Taylor's movements, vehicle registration searches, postal service records, rental agreements, and billing history. *See* Dkt. 85-1 at ¶¶ 34-52. And ultimately, after being arrested, Taylor confessed to his involvement in drug dealing and the Walmart shoot-out, all of which was later memorialized in the Statement of Facts. Dkt. 85 at 6. Taylor does not dispute this. Accordingly, given the limits of *Brady* per *Ruiz,* and given the balance of the extant evidence, Taylor's counsel was not

constitutionally deficient when he declined to pursue fruitless motions or investigations, and instead decided to enter plea negotiations which avoided the risk of going to trial. The law and record conclusively show that Taylor is entitled to no relief on this ground. Therefore, Taylor's petition in this part is denied without the need for an evidentiary hearing. *See* 28 U.S.C. § 2255(b).

### B. Failure to File Requested Appeal

Taylor next argues that his counsel failed to appeal his sentence, as he allegedly requested. If Taylor's allegation is true, it amounts to per se ineffective assistance of counsel. *United States v. Poindexter*, 492 F.3d 263, 273 (4th Cir. 2007). The Government submits a sworn statement of Dean, Taylor's former counsel, which avers that Taylor never in fact requested that an appeal be filed. However, the Court finds that the competing allegations on this issue raise a credibility dispute that is best resolved after an evidentiary hearing. Therefore, the Court will direct that an evidentiary hearing be scheduled for the purpose of determining whether Taylor in fact requested that his counsel file an appeal.

### C. Solicitation of Spouse

Finally, Taylor alleges that Dean "attempted to solicit [his] spouse, inviting her to after hours' appointments to discuss financial matters in Taylor's representation." Dkt. 80 at 6. His spouse, Stephanie Booker, states the allegation more fully:

> On May 23rd, 2022, Mr. Dean requested I come by his office at pm to give me a "detailed update on the status of things." When I arrived the front door to the office was locked and no one appeared to be there. When I called the front desk Mr. Dean answered and stated he was coming to the door. Mr. Dean then opened a door that was a couple doors down from the main office. No one else was in the office. When I asked where everyone was Mr. Dean replied, "oh, everyone has already gone home. I didn't see any reason we couldn't meet." We had a brief conversation regarding

        Mr. Taylor's case. I then asked if we could reschedule during regular business hours because I did not feel comfortable.

Dkt. 80-2.

    Taylor notes that Dean was later disbarred for very similar conduct. According to Virginia State Bar Docket Nos. 23-080-126978 and 23-080-128558, Dean solicited one of his client's girlfriend's sister when Dean met her at a hearing. Dean invited the woman, identified as "AZ," to come meet him at his office after hours, with AZ believing it was a job interview. Over a series of interactions in which AZ came to Dean's office after-hours, Dean eventually offered AZ gifts in exchange for sexual favors. After the bar opened an investigation into his conduct, Dean resigned his law license.

    But here, even if Dean's conduct amounted to solicitation—despite Booker herself not using that language—Taylor does not attempt to explain how Dean's actions affected his legal representation, for purposes of ineffective assistance under *Strickland*.

    Because the petitioner bears the burden of proving prejudice and Taylor has not met this burden, his petition on this ground is summarily dismissed without the need for an evidentiary hearing. *See* 28 U.S.C. § 2255(b).

### IV. Conclusion

    In an order that will accompany this memorandum opinion, and for the reasons stated above, the Court will **DENY** Taylor's motion**,** Dkt. 80, *except* for the portion of his motion which alleges that his counsel failed to file a requested appeal. As to that issue, the Court will direct that an evidentiary hearing be scheduled to determine whether Taylor in fact requested that an appeal be filed. The Government's motion to dismiss, Dkt. 85, is **GRANTED** except for the failure to appeal issue.

The Clerk of Court is directed to send a copy of this Memorandum Opinion to all counsel of record and to Petitioner.

Entered this  17th  day of April, 2025.

                                                              NORMAN K. MOON
                                                              SENIOR UNITED STATES DISTRICT JUDGE